UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | |
|---|---|---|
| | § | |
| v. | § | CRIMINAL NO. H-11-259 |
| | § | |
| ARMANDO CHAVEZ, M.D. | § | |
| Defendant | | |

## PLEA AGREEMENT

The United States of America, by and through JOSE ANGEL MORENO, United States Attorney for the Southern District of Texas and Cedric L. Joubert, Assistant United States Attorney, and the defendant, ARMANDO CHAVEZ, M.D., and defendant's counsel, LOUIS LEICHTER and DEXTER GILFORD, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### The Defendant's Agreement

1. The defendant agrees to waive indictment and to plead guilty to Criminal Information. The Criminal Information charges the defendant with Conspiracy to commit Mail Fraud and Mail Fraud, in violation of Title 18, United States Code, Sections 371 and 1341. The defendant, by entering this plea agrees that

1

he is waiving any right to have the facts that the law makes essential to the punishment either charged in the Information, or proved to a jury or proven beyond a reasonable doubt.

## Punishment Range

2. The statutory maximum penalty for each violation of Title 18, United States Code, Section 371, is imprisonment of not more than five (5) years and a fine of not more than $250,000. The statutory maximum penalty for each violation of Title 18, United States Code, Section 1341, is imprisonment of not more than twenty (20) years and a fine of not more than $250,000. Additionally, the defendant may receive a term of supervised release after imprisonment of three (3) years. Title 18, U.S.C. §§ 3559(a)(4) and 3583(b)(2). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then defendant may be imprisoned for the entire term of supervised release up to two (2) years, without credit for time already served on the term of supervised release prior to such violation. Title 18, U.S.C. §§ 3559(a)(4) and 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

## Mandatory Special Assessment

3. Pursuant to Title 18, U.S.C. § 3013(a)(2)(A), immediately after

sentencing, defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction. The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

**Fine and Reimbursement**

4.  Defendant understands that under the Sentencing Guidelines, the Court is permitted to order the defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release; if any is ordered.

5.  Defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately, and defendant will not attempt to avoid or delay payment.

6.  Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500) prior to sentencing if he is requested to do so. In the event that the Court imposes a fine or orders the payment of restitution as part of the Defendant's sentence, the Defendant shall make complete financial disclosure by truthfully executing a sworn financial statement immediately following his sentencing. Further, the Defendant agrees to full restitution to the

victim(s) regardless of the counts of conviction.

## Cooperation

7. The parties understand this agreement carries the potential for a motion for departure under Section 5K1.1 of the Sentence Guidelines. The defendant understands and agrees that whether such a motion is filed will be determined solely by the United States through the United States Attorney for the Southern District of Texas. Should the defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance", the United States reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the <u>Sentencing Guidelines and Policy Statement</u>. The defendant further agrees to persist in that plea through sentencing, fully cooperate with the United States, not oppose the forfeiture of assets contemplated in paragraphs 19 and 20 of this agreement. The defendant understands and agrees that the United States will request that sentencing be deferred until that cooperation is complete.

8. The defendant understands and agrees that "fully cooperate" as used herein, includes providing all information relating to any criminal activity known to defendant, including but not limited to Mail Fraud and Health Care Fraud. The defendant understands that such information includes both state and federal offenses arising therefrom.

In that regard:

(a) Defendant agrees that this plea agreement binds only the United States Attorney for the Southern District of Texas and defendant; it does not bind any other United States Attorney or any other unit of the Department of Justice;

(b) Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States. Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this agreement;

(c) Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

(d) Defendant agrees to provide truthful, complete and accurate information and testimony and understands any false statements made by the defendant to the Grand Jury or at any court proceeding (criminal or civil), or to a government agent or attorney can and will be prosecuted under the appropriate perjury, false statement or obstruction statutes;

(e) Defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation.

(f) Should the recommended departure, <u>if any</u>, not meet the defendant's expectations, the defendant understands he remains bound by the terms of this agreement and cannot, for that reason alone, withdraw his plea.

## Waiver of Appeal

9. Defendant is aware that Title 18, U.S.C. § 3742 affords a defendant the right to appeal the sentence imposed. The defendant agrees to waive the right to appeal the sentence imposed or the manner in which it was determined. The

defendant may appeal only a sentence imposed above the statutory maximum. Additionally, the defendant is aware that Title 28, U.S.C. § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. The defendant waives the right to contest his conviction or sentence by means of any post-conviction proceeding.

10. In agreeing to these waivers, defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United States or the Probation Office, is a prediction, not a promise, **did not induce his guilty plea**, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *United States v. Booker*, 125 S.Ct. 738 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

11. The Defendant understands and agrees that each and all waivers

contained in the Agreement are made in exchange for the concessions made by the United States in this plea agreement.

## The United States' Agreements

12. The United States agrees to each of the following:

(a) If defendant pleads guilty to Criminal Information and persists in that plea through sentencing, and if the Court accepts this plea agreement, the United States will not bring any further charges arising out of the facts which form the basis for this agreement or related conduct. The United States, in its sole discretion, reserves the right to file a motion pursuant to section 5K1.1 of the U.S.S.G.

(b) At the time of sentencing, the United States agrees not to oppose defendant's anticipated request to the Court and the United States Probation Office that he receive a two (2) level downward adjustment pursuant to U.S.S.G. Section 3E1.1(a) should the defendant accept responsibility as contemplated by the Sentencing Guidelines;

(c) If the defendant qualifies for an adjustment under U.S.S.G. Section 3E1.1(a), the offense level determined prior to the operation of 3E1.1(a) is level 16 or greater, and the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate resources efficiently, the United States agrees to request an additional one level downward adjustment.

(d) If the defendant continues to truthfully and fully cooperate in this and other investigations, the United States agrees he will not be prosecuted in the Southern District of Texas for related conduct, if any, in other investigations already known to the United States.

## United States' Non-Waiver of Appeal

13. The United States reserves the right to carry out its responsibilities under the sentencing guidelines. Specifically, the United States reserves the right:

(a) to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a Pre-Sentence Report;

(b) to set forth or dispute sentencing factors or facts material to sentencing;

(c) to seek resolution of such factors or facts in conference with defendant's counsel and the Probation Office;

(d) to file a pleading relating to these issues, in accordance with U.S.S.G. Section 6A1.2 and Title 18, U.S.C.§ 3553(a); and,

(e) to appeal the sentence imposed or the manner in which it was determined.

## Sentence Determination

14. Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, U.S.C. § 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable

Sentencing Guidelines. Defendant understands and agrees the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

## Rights at Trial

15. Defendant represents to the Court that he is satisfied that his attorney has rendered effective assistance. Defendant understands that by entering into this agreement, he surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a) If defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States, and the court all agree.

(b) At a trial, the United States would be required to present witnesses and other evidence against the defendant. Defendant would have the opportunity to confront those witnesses and his attorney would be allowed to cross-examine them. In turn, the defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for defendant would not appear voluntarily, he could require their attendance through the subpoena power of the court.

© At a trial, defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if the defendant desired to do so, he could testify on his own behalf.

## Factual Basis for Guilty Plea

16. Defendant is pleading guilty because he is guilty of the charges contained in the Criminal Information. If this case were to proceed to trial, the United States could prove each element of the offense beyond a reasonable doubt. The following facts, among others would be offered as proof to establish the Defendant's guilt:

A. Amando Chavez was born in Pharr, Texas where he completed his secondary education in 1987. He attended Rice University in Houston, and after three years, enrolled in medical school. He graduated medical school at Baylor University College of Medicine in Houston in 1994. He completed his internship and residency in Internal Medicine at the University of Texas School of Medicine. He was licensed to practice medicine in 1997 by the Texas State Board of Medical Examiners. Upon completing his internship and receiving his license, he began to practice medicine with his father-in-law, Dr. Antonio Orengo, in Houston, Texas, at the Orengo Medical Clinic on the far east side of Houston. The clinic engaged primarily in a general practice of Family Medicine. Dr. Orengo retired in 2004, and Dr. Chavez took over the clinic under the name of Chavez Medical Group (CMG).

B.  Dr. Chavez hired his sister, Gricelda Chavez, to work at his clinic as the Office Manager and Administrator. He hired other employees, including medical technicians and medical assistants. Most of these employees had no prior medical training and were trained on the job at the Chavez Medical Clinic. Dr. Chavez trained a staff employee to handle medical billing. She had to learn billing on the job, especially Current Procedural Terminology, or "CPT" codes.

### PHOTO-FACIALS AND SKIN DERM-ABRASION

C.  Although Dr. Chavez started his practice with his father-in-law primarily in Family Medicine, at some point in his practice, Dr. Chavez wanted to increase his income from his medical practice. He looked for other areas of medical practice which would help him accomplish this. He decided to add photo-facials and skin derm-abrasion to his practice. He discontinued these procedures after they failed to produce any substantial increase in income or profits.

D.  **VEIN ABLATION OR "ELVES" PROCEDURES**

After photo-facials and skin derm-abrasion procedures failed to substantially increase income, Dr. Chavez continued to look for ways to increase his income. Around 2005, Dr. Chavez began to incorporate Endovenous Laser Vein Ablation procedures into his medical practice. Since he had not been previously trained in this area, he attended a brief two-day training seminar. At his clinic, the vein ablation

procedure was commonly referred to as "ELVES." In a short period of time, the number of ELVES procedures performed by Dr. Chavez increased and became his primary focus. Dr. Chavez delegated other physicians to handle the Internal Medicine practice at CMG. At some point, Dr. Chavez began practicing exclusively the ELVES vein oblation procedure. Depending on the number of veins treated for a patient, the ELVES procedure paid between $6,000 and $14,000 per patient by private insurance companies. Dr. Chavez found this to be lucrative source on income for his practice and he exploited it.

E. To increase his ELVES practice, Chavez hired an advertisement coordinator and advertised on television and radio to attract potential vein patients. These advertisements targeted the Hispanic community on Spanish speaking radio and television. After increasing the use of ELVES procedure in his practice, Dr. Chavez hired "vein consultants." These were young employees who lacked any medical training. These "consultants" were told to meet with potential vein patients to find out if they had insurance which made them eligible for ELVES procedures. Dr. Chavez also directed his technicians to screen patients for private insurance. He trained his employees to identify potential patients who qualified for the ELVES procedure with private insurance while patients were in the clinic for treatment of other ailments. Dr. Chavez, and employees at his direction, discouraged cash-only and Medicare and

Medicaid patients from receiving ELVES procedures, preferring higher-paying private insurance companies. Private insurance was a pre-requisite for the ELVES treatment, since Medicare or Medicaid did not pay amounts acceptable to Dr. Chavez. For this reason, many patients who came to CMG seeking treatment for various aesthetic or medical issues regarding their legs and veins, such as spider veins, were encouraged and often fraudulently advised that they should have the ELVES procedure. Therefore, "qualified" patients were systematically advised and encouraged by "vein consultants" or by Dr. Chavez of their need for the ELVES procedure.

F. Patients who qualified for ELVES routinely underwent ultrasound and echo cardiogram tests before meeting with Dr. Chavez for an evaluation and explanation of the ELVES procedures. To expedite the process of seeing patients, Dr. Chavez developed a template for pre-operational evaluation reports for ELVES patients. In an effort to assure approval and payment for ELVES procedures, Dr. Chavez took language from web-sites and policy coverage manuals of private insurance companies and copied the language directly onto a template he created to evaluate ELVES patients. This way, the diagnostic language in his template would track the language found in insurance company coverage policy manuals which increased the likelihood for approval of the vein ablation procedures. In doing this, Dr. Chavez tailored this pre-operational evaluation template for his vein patients, keeping major portions of the

reports substantially the same for the majority of ELVES patients. These reports routinely included false statements, such as patient interviews, patient history and health condition. These "pre-op" reports were often sent to insurance companies to determine patient coverage eligibility in advance for "pre-payment."

G.  ELVES patients would typically undergo ELVES surgeries over a two day period, operating on the veins in the front of the legs on one day, and the veins in the back of the legs on another day. In a review of over 800 patient files, the majority of the bills sent to insurance companies for patients receiving the ELVES procedure stated the patient underwent surgery on all six treatable vein portions on both legs, on six different dates, when usually a patient was either (1) actually treated for fewer than six veins, and or (2) almost always treated on only two days or less than six days as indicated on the billing form.

H.  **MEDICAL BILLING AND "UNBUNDLING"**

At the direction and instruction of Dr. Chavez, his billing clerk unbundled the dates of surgery (billing for multiple procedures over various dates of surgery beyond the actual dates of surgery). He also instructed her to unbundle billing codes used for the ELVES procedure. This practice effectively increased payments received from health care programs and insurance companies. By example, if the ELVES procedure was billed as one "bundled" procedure for both legs over two days, the payment was

typically less than $8,000 for one patient. If the billing for the same patient was "unbundled" and billed for six procedures over a period of six days, the typical payment received by Dr. Chavez was about $14,000. The billing clerks,

under the direction and approval of Dr. Chavez, also practiced "pre-billing" (billing prior to the actual date of service) for ELVES. This practice led to some occasions in which insurance company providers were billed for procedures which were never performed. For the three year time period of 2005-2007, Dr. Chavez billed seven health insurance programs for more than $14.1 million for ELVES and ELVES related claims, the greater majority of which were false or fraudulent. These claims resulted in payments of approximately $3.8 million in payments to Dr. Chavez. These checks were sent to Dr. Chavez by insurance companies typically using the U.S. mail. Each of the checks identified in the criminal information were sent through the U.S. mail.

## CONCLUSION

I. In a letter to the Texas Medical Board, Dr. Chavez requested to be allowed to continue his practice in internal medicine and vein treatments, claiming to have helped "countless patients with medical varicose vein leg pain relief and cured many chronic venous stasis ulcers." Dr. Chavez's ELVES scheme and conduct exposed patients to risk of serious bodily injury with unnecessary surgeries.

## Breach of Plea Agreement

17. If defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and the defendant's plea and sentence will stand. If at any time defendant retains, conceals or disposes of assets in violation of this plea agreement, or if defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

18. Whether the defendant has breached any provision of this plea agreement shall be determined solely by the United States through the United States Attorney's Office, whose judgment in that regard is final.

## Forfeiture

19. This plea agreement is being entered into by the United States on the basis of defendant's express representation that he will make a full and complete disclosure of all assets over which he exercises direct or indirect control, or in which

he has any financial interest. Defendant agrees to forfeit whatever interest he may have in assets derived from crimes charged in the Criminal Information.

20. Defendant consents to any agreed order of forfeiture or judgment, and further agrees to take all steps necessary to pass clear title to assets subject to forfeiture to the United States. Defendant further consents to surrendering of title, signing a consent decree, stipulating facts regarding the transfer of title and basis for the forfeiture, and signing any other documents necessary to effectuate such transfer. Defendant also agrees to direct any banks which have custody of defendant's assets to deliver all funds and records of such assets to the United States.

## Complete Agreement

21. This written plea agreement, consisting of 19 pages, including the attached addendum of defendant and his attorney, constitutes the complete plea agreement between the United States, defendant and his counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

22. Any modification of this plea agreement must be in writing and signed by all parties.

Filed at ___Houston___, Texas, on ___June 9___, 2011.

_____
Defendant

Subscribed and sworn to before me on ___June 9___, 2011.

DAVID J. BRADLEY
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

JOSE ANGEL MORENO
UNITED STATES ATTORNEY

By: _____
Cedric L. Joubert
Assistant United States Attorney
Southern District of Texas
Telephone: 713-567-9717
Facsimile: 713-718-3304

_____
LOUIS LEICHTER
Attorney for Defendant
1602 East 7th Street
Austin, Texas 78702
louis@leichterlaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| UNITED STATES OF AMERICA | § | |
| --- | --- | --- |
| | § | |
| v. | § | CRIMINAL NO. H-11-259 |
| | § | |
| ARMANDO CHAVEZ, M.D. | § | |

## PLEA AGREEMENT - ADDENDUM

I have fully explained to defendant his rights with respect to the pending indictment. I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and I have fully and carefully explained to defendant the provisions of those Guidelines which may apply in this case. I have carefully reviewed every part of this plea agreement with defendant. To my knowledge, defendant's decision to enter into this agreement is an informed and voluntary one.

_____   JUNE 9 2011
LOUIS LEICHTER                Date
Attorney for Defendant

I have consulted with my attorney and fully understand all my rights with respect to the indictment pending against me. My attorney has fully explained and I understand all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual which may apply in my case. I have read and carefully reviewed every part of this plea agreement with my attorney. I understand this agreement and I voluntarily agree to its terms.

_____   6/9/11
ARMANDO CHAVEZ                Date
Defendant

Effective Date: 1/14/03